**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **OFELIA ROSARIO AND EDUARDO ZAYAS,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA et al.,**<br><br>**Defendants.** | **CIVIL NO. 14-1410 (GAG)** |

**OPINION AND ORDER**

This case arose out of the tragic death of Frankie Rondón-Rosario ("Rondón-Rosario"), who was murdered hours after reporting to duty as an unarmed security officer at the former naval base, Sábana Seca in Toa Baja, Puerto Rico. Rondón-Rosario's mother, Ofelia Rosario, and his brother, Eduardo Rondón-Rosario (collectively referred to as "Plaintiffs") filed this lawsuit against the United States of America, Sábana Seca Land Management, LLC, Forest City Residential Group, Inc., ("FCRG"), and other fictitious companies (collectively referred to as "Defendants"), alleging that Defendants are liable to Plaintiffs for their negligence that caused the death of Rondón-Rosario. (Docket No. 1.) Plaintiffs brought their claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and Articles 1802 and 1803 of the Puerto Rico Civil Code. (See Docket No. 1.)

Presently before the court is FCRG's motion for summary judgment in which it argues that Plaintiffs failed to file the present case within the one-year statutory period for the supplemental claims brought under Articles 1802 and 1803 and, in the alternative, that FCRG and the United States are statutorily immune from suit. (Docket No. 48.) The United States joined FCRG's

motion. (Docket No. 52.) After reviewing the parties' submissions and pertinent law, the court hereby **DENIES** Defendants' motion for summary judgment at Docket No. 48.

## I. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.Civ. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all

reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II. Relevant Factual and Procedural Background

Rondón-Rosario began working for Securitas Security Services of Puerto Rico, Inc. ("Securitas") in March, 2006. (Docket Nos. 64 ¶ 1.4; 75 ¶ 1.4.) On the morning of October 19, 2011, he was assigned to the former Naval Base known as Sábana Seca, in Toa Baja, Puerto Rico. (Docket Nos. 64 ¶ 1.5; 75 ¶ 1.5.) Although Rondón-Rosario had been working for Securitas for years, October 19, 2011 was his first time being assigned to Sábana Seca, as he spent years working for Securitas at Toyota in Río Piedras. (Docket Nos. 64 ¶¶ 1.6, 1.8; 75 ¶¶ 1.6, 1.8.) While on duty that morning, Rondón-Rosario was shot and killed by intruders to Sábana Seca. (Docket Nos. 49 ¶ 26; 64 ¶¶ 1.5, 26; Docket No. 75 ¶ 1.5.) Throughout the entire time period that Rondón-Rosario worked for Securitas, Rosario understood that Securitas was his only employer. (Docket Nos. 64 ¶ 1.7; 75 ¶ 1.7.) Further, on the morning that Rondón-Rosario was killed, his family believed that he was working at Toyota in Río Piedras. (Docket Nos. 64 ¶ 1.8; 75 ¶ 1.8.)

At all times relevant to the complaint, Securitas was an insured employer under the Puerto Rico Workmen's Compensation Act. (Docket Nos. 64 ¶ 1.12; 75 ¶ 1.12.) Shortly after Rondón-Rosario's death, Securitas representatives contacted Rosario and asked to her meet in order to sign some paperwork for insurance purposes. (Docket No. 64-1 at 4.) During that meeting, Rosario learned about her right to make a claim with the Puerto Rico State Insurance Fund. (Docket Nos.

64 ¶ 1.14; 75 ¶ 1.14.) Thereafter, Rosario learned that because Securitas was insured by the State Insurance Fund, it was immune from any claim that she might have brought against it for the damages incurred as a result of her son's death. (Docket Nos. 64 ¶ 1.15; 75 ¶ 1.15.) As such, Rosario requested reimbursement for her son's funeral expenses from the State Insurance Fund. (Docket Nos. 64 ¶ 1.13; 75 ¶ 1.13.) Thereafter, on June 20, 2012, the Puerto Rico State Insurance Fund concluded in a formal report that Rondón-Rosario had died in a work-related accident. (Docket Nos. 49 ¶ 27; 64 ¶ 27.) The report identified Securitas as Rondón-Rosario's employer and the location of his death as "Navy Base – Forest City." (Docket Nos. 49 ¶¶ 28-29; 64 ¶ 28-29.)

From 2011 to 2013, Rosario attended the criminal proceedings in the United States District Court brought against the perpetrators responsible for Rondón-Rosario's death. (Docket Nos. 64 ¶ 1.16; 75 ¶ 1.16.) During these proceedings, Rosario never heard the names of any corporate entities such as Sábana Seca Land Management, Sábana Seca Partners, Forest City, Midwest Family, or Midwest Military. (Docket Nos. 64 ¶ 1.17; 75 ¶ 1.17.) Almost two years after Rondón-Rosario's death, Rosario met with an attorney to explore her legal options and to prepare a claim against the United States. (Docket Nos. 64 ¶ 1.20; 75 ¶ 1.20.) At that time, Rosario did not think that anyone other than the United States Navy was the owner or manager of the Sábana Seca naval base. (Docket Nos. 64 ¶ 1.19; 75 ¶ 1.19.)[1] On October 15, 2013, Plaintiffs, through counsel, formally submitted a complaint under the FTCA to the Office of the Judge Advocate General. (Docket Nos. 49 ¶ 31; 64 ¶ 31.) The extrajudicial claim was directed exclusively at the United

---

[1] In its opposition to Plaintiffs' separate statement of material facts, Defendants deny many of Plaintiffs' statements, like they do in paragraph 1.19, by arguing that because Rosario worked in a law firm and had access to attorneys, she should have figured out which company managed the naval base. (See Docket No. 75 ¶ 1.19.) This denial, however, does not effectively create an issue of material fact as to Rosario's knowledge of the manager of Sabana Seca. See Local Rule 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."); Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (emphasizing the importance of rules within Local Rule 56 and noting that "litigants ignore them at their peril"). As such, the court will deem these denials as admissions.

States Navy and did not identify any other parties as being liable for Rondón-Rosario's death. (Docket Nos. 49 ¶ 33; 64 ¶ 33.) On November 25, 2015, the Office of the Judge Advocate General denied Plaintiffs' FTCA claim, concluding that "Sábana Seca Land Management, a contractor with the United States, was responsible for all activities including security, in connection with maintaining the former U.S. Navy facility at Sábana Seca . . . ." (Docket Nos. 64 ¶ 1.23; 64-6 at 2; 75 ¶ 1.23.) The letter also indicated that Plaintiffs can contact said contractor at "Sábana Seca Land Management c/o Forest City Residential Group, Inc." (Docket Nos. 64 ¶ 1.24; 64-6 at 2; 75 ¶ 1.24.) Prior to then, Plaintiffs had not filed any type of extrajudicial claim against any other parties. (Docket Nos. 49 ¶ 34; 64 ¶ 34.)

On May 19, 2014, Plaintiffs filed a complaint in this court against the United States, and the entities identified by the Navy, Sábana Seca Land Management LLC and FCRG, for the damages incurred as the result of Rondón-Rosario's death. (Docket No. 1.) Thereafter, FCRG and the United States filed their answers. (Docket Nos. 13 and 31.) The parties then conducted limited discovery, primarily for the purpose of supporting and disputing FCRG's affirmative defenses of statutory of limitations and statutory employer immunity. (Docket No. 45.)

That discovery revealed the following facts. In 1996, Congress passed the Military Housing Privatization Initiative to leverage private sector financing and construction methods for the purpose of building and rehabilitating military-family housing. (Docket Nos. 64 ¶ 2.1; 75 ¶ 2.1.) Under this initiative, the federal government asked private developers to submit proposals to build military-style family housing and after the government chose a bidder, it leased the land to a developer under a long-term ground lease. (Docket Nos. 64 ¶ 2.2; 75 ¶ 2.2.) Specifically, the United States Navy issued requests for proposals regarding the creation of partnerships for the development and operation of housing in support of the Navy operation in the Midwest region of

the United States, known as the Navy Midwest Project. (Docket Nos. 64 ¶ 2.3; 75 ¶ 2.3.) Relevant to the present case, in 2005, Midwest Military Communities, LLC submitted a bid for the Navy Midwest Project and its company Midwest Family Housing, LLC acquired the contract. (Docket Nos. 64 ¶¶ 2.4-2.5;75 ¶¶ 2.4-2.5.)

Thereafter, Midwest Family Housing formed Sábana Seca Partners, LLC, in which it owns a one hundred percent membership interest, for the purpose of marketing and disposing of former naval base Sábana Seca. (Docket Nos. 64 ¶ 3.1; 75 ¶ 3.1.) According to the operating agreement of Sábana Seca Partners, the monies obtained from the sale of the Sábana Seca property would finance the acquisition and development of certain Navy properties in the Midwest of the United States. (Docket Nos. 64 ¶ 3.2; 75 ¶ 3.2.) In late 2005, Midwest Family Housing designated Sábana Seca Land Management, LLC as the manager of Sábana Seca Partners, with the authority to hold and maintain assets held by Sábana Seca Partners. (Docket Nos. 64 ¶ 3.4; 75 ¶ 3.4.) As manager, Sábana Seca Land Management was given the authority and obligation to manage and control the business of marketing, maintenance and sale of the Sábana Seca property, including the power to subcontract with third parties for security and ground maintenance services. (Docket Nos. 64 ¶ 3.5; 75 ¶ 3.5.)

In 2010, Midwest Military Communities, LLC and the United States Navy entered into a Second Amended and Restated Limited Liability Operating Agreement, under which Midwest Family Housing, LLC was to be responsible for the lease, design, financing, development, management, operation, and maintenance of the residential units on certain Navy properties. (Docket Nos. 64 ¶ 4.1; 75 ¶ 4.1.) Pursuant to this agreement, FCRG was contracted by Midwest Family Housing to manage certain properties. (Docket Nos. 64 ¶ 4.3; 75 ¶ 4.3.) As a result, FCRG became in charge of the management and administration of Sábana Seca and was the

manager of the former naval base during all times relevant to the complaint, including the day of Rondón-Rosario's death.  (Docket Nos. 49 ¶ 7; 64 ¶ 7.)

Prior to these agreements, Forest City Enterprises, the holding company for FCRG, had entered into a "National Contract" with Securitas Security Services USA, Inc., the parent company that wholly owns Securitas, to provide unarmed security services at Forest City's locations throughout the United States.  (Docket Nos. 49 ¶ 14; 64 ¶¶ 5.4-5.7; 75 ¶¶ 5.4-5.7; 75-4 at 1.) Plaintiffs also point to a "Letter of Engagement" between Sábana Seca Land Management (signed on its behalf by FCRG) and Securitas of Puerto Rico that defines the relationship between the parties, but Defendants claim that this agreement was superseded by the aforementioned National Contract.  (Docket Nos. 49-3 at 16; 64 ¶¶ 5.4-5.6; 75 ¶ 5.4-5.6.)  This agreement states that "this letter represents the entire agreement between [Sábana Seca Land Management] and [Securitas] and shall supersede any prior understanding, agreement or contract, whether written or oral." (Docket No. 49-3 at 16.)  Under the agreement that Defendants claim is controlling, Security Services USA is required to insure all of its employees with the statutory workers compensation available in each state, but it does not address Puerto Rico or Securitas specifically.  (Docket Nos. 49 ¶ 18; 49-2 at 2; 64 ¶ 18.)  Under the Letter of Engagement, there is no mention of workers compensation insurance.  (See Docket Nos. 49-3 at 16; 64 ¶ 5.6.)  Lastly, despite the National Contract being between Forest City Enterprises and Securitas Security Services USA, one of the addendums to said contract is signed by Pedro Rosario Medina, the Area Vice President for Securitas of Puerto Rico.  (Docket No. 49-3 at 5-6.)

From this evidence, the following can be gleaned with respect to the connections between the aforementioned companies.  Midwest Military Communities, LLC, an Illinois company, is a managing member, along with the United States Navy, in a public-private enterprise designed to

develop residential units and to conduct sales of properties in former military bases throughout the United States. (Docket Nos. 64 ¶ 6.1; 75 ¶ 6.1.) This public-private enterprise is performed by a separate company, Midwest Family Housing, LLC, also an Illinois company. (Docket Nos. 64 ¶ 6.2; 75 ¶ 6.2.) The purpose of Midwest Family Housing, is to perform services with respect to Navy properties throughout Navy Regions Midwest and Mid-South. (Docket Nos. 64 ¶ 6.3; 75 ¶ 6.3.) Midwest Family Housing is also charged with developing housing opportunities on the land of the navy base in Sábana Seca. (Docket Nos. 64 ¶ 6.4; 75 ¶ 6.4.) FCRG is a managing member of Midwest Family Housing. (Docket Nos. 64 ¶ 6.5; 75 ¶ 6.5.) Midwest Family Housing is also a member of Sábana Seca Partners, LLC, a company which was formed for the purpose of marketing and selling the Sábana Seca Navy base to a third party for its maximum value. (Docket Nos. 64 ¶ 6.6; 75 ¶ 6.6.) As a member of Sábana Seca Partners, Midwest Family Housing is considered to have an ownership interest in the company. (Docket Nos. 64 ¶ 6.7; 75 ¶ 6.7.)

Furthermore, Sábana Seca Land Management, LLC is the manager of Sábana Seca Partners, with "full and exclusive authority in the management and control of Sábana Seca Land Partners." (Docket Nos. 64 ¶ 6.8; 75 ¶ 6.8.) FCRG is the managing member of Sábana Seca Land Management and of Midwest Family Housing, and Midwest Military Communities. (Docket Nos. 64 ¶ 6.9; 75 ¶ 6.9.) Yet another entity, Forest City Enterprises entered into a "National Contract" with Securitas Security Services USA, Inc., for the latter company to provide unarmed security services at unspecified locations. (Docket Nos. 64 ¶ 6.10; 75 ¶ 6.10.) Neither FCRG nor Securitas Security Services of Puerto Rico are parties to the "National Contract" between Forest City Enterprises and Securitas Security Services USA. (Docket Nos. 64 ¶ 6.11; 75 ¶ 6.11.)[2]

---

[2] Defendants deny Plaintiffs' statements of uncontested facts in which they state that neither FCRG nor Securitas were parties to this agreement by citing emails and other communication which indicates that FCRG exercised input as to the security services at Sábana Seca. This does not, however, properly controvert Plaintiffs'

Defendants claim that despite the fact that the agreement is between Forest City Enterprises and Securitas Security Services USA, all security services provided by the latter in Puerto Rico were done by their wholly owned subsidiary, Securitas Security Services of Puerto Rico. (Docket No. 75 ¶ 6.10.) Defendants point to numerous emails and other communications to show that FCRG has significant control and oversight over the manner in which Securitas provided security at Sábana Seca. (See Docket Nos. 75 ¶ 6.11; 75-3.) Lastly, neither Sábana Seca Land Management nor Sábana Seca Partners are parties to the contract between Forest City Enterprises and Securitas Security Services USA. (Docket Nos. 64 ¶ 6.12; 75 ¶ 6.12.)

On January 23, 2015, FCRG moved this court for summary judgment, arguing that Plaintiffs failed to file the present case within the one-year statutory period for the supplemental claims brought under Articles 1802 and 1803 of the Puerto Rico Civil Code and, in the alternative, that FCRG is statutorily immune from suit under the Puerto Rico Workmen's Compensation Act ("PRWCA"), P.R. Laws Ann. tit. 11, § 1 *et seq*. (Docket No. 48.) The next day, the United States moved to join FCRG's motion, noting that FCRG's arguments also apply to the United States. (Docket No. 52.) Plaintiffs thereafter filed their opposition to FCRG's motion for summary judgment, in which they argue that the one-year statute of limitations period tolled for their claim against FCRG because the complicated business structure of the management did not allow for Plaintiffs to be on notice of the true entity liable for Rondón-Rosario's death. (Docket No. 63.) Plaintiffs also argue that FCRG is not immune from liability under the PRWCA due to this complication organizational structure. (Id.) FCRG then filed a reply to Plaintiffs' opposition,

---

statements. As such, the court will deem these denials as admissions. See Local Rule 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."); Caban Hernandez, 486 F.3d at 7.

which the United States subsequently moved to join. (Docket Nos. 74 and 79.) Plaintiffs then surreplied Defendants' motion. (Docket No. 89.)

After reviewing the parties' submissions and pertinent law, the court hereby **DENIES** Defendants' motion for summary judgment at Docket No. 48.

**III. Discussion**

As noted above, in moving for summary judgment, Defendants argue that Plaintiffs' claim must be dismissed because it is undisputed that they failed to file their claim against FCRG within the required one-year limitations period. (Docket No. 48 at 18-19.) With respect to the tolling of Plaintiffs' claim, Defendants argue that Plaintiffs were required under the law to exercise at least some diligence in identifying the potential tortfeasors who might be liable for Rondón-Rosario's death and they did not. (Id. at 19.) In the alternative, Defendants argue that the requisite legal nexus exists between the United States Navy as the property owner, FCRG as its contractor, and Securitas as the subcontractor which grants both the United States and FCRG immunity under Puerto Rico's statutory employer doctrine. (Id. at 19-22.) In response, Plaintiffs highlight that although the United States joined FCRG's motion regarding the statutory of limitations, there are two different limitations periods applicable to FCRG and the United States, and, as such, Plaintiffs undisputedly filed their claim against the United States in a timely manner. (Docket No. 63 at 20-21.) They also argue that the one-year limitations period applicable to FCRG was tolled because under Puerto Rico law, a reasonable person in Rosario's position could not have identified FCRG as a possible tortfeasor liable for the death of her son. (Id. at 21-24.) Plaintiffs further argue that neither FCRG nor the United States Navy can be considered statutory employers because the complicated relationship between all of the companies involved in the contracting with the United

States does not create the relationship that the Puerto Rico Supreme Court has deemed necessary for the exception to apply. (Id. at 18-20.)

Although Defendants assert their statute of limitations arguments first, the court will address the statutory employer doctrine issue before said argument because irrespective of whether Plaintiffs are barred by the limitations period from asserting their claims against FCRG, the court will need to flesh out the statutory employer doctrine as to the United States.

A. Statutory Employer Doctrine

Generally speaking, Article 1802 of Puerto Rico Civil Code provides that a "person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. LAWS ANN. tit. 31, § 5141. However, under the PRWCA scheme, "when an employee suffers an injury, illness, disability or death as a result of 'any act or function inherent in [his] work,' and his employer is insured according to law, the employee's right to compensation from the employer is limited to the statutory compensation offered through the State Insurance Fund." Vega-Mena v. United States, 990 F.2d 684, 686 (1st Cir. 1993) (citing P.R. LAWS ANN. tit. 11, §§ 2, 21; Santiago Hodge v. Parke Davis & Co., 126 P.R. Dec. 1 (1990) (certified translation reprinted in Santiago Hodge v. Parke Davis & Co., 909 F.2d 628, 635 (1st Cir. 1990)). Accordingly, the injured worker lacks a cause of action against his employer for damages irrespective of whether the employer was indeed negligent. Vega-Mena, 990 F.2d at 686. The purpose of this statutory scheme is for workers, who "waive their right to sue their employer in exchange for a benefit which could eventually be smaller," to receive "reliable, immediate and certain" compensation. P.R. LAWS ANN. tit. 11, § 1a. The PRWCA does not, however, prevent injured workers from suing a third party in tort for the worker's insured injuries if that third party

is a stranger to the employer-employee relationship. See Santiago Hodge, 909 F.2d at 637 (reprinted translation of Santiago Hodge, 126 P.R. Dec. 1).

The Puerto Rico Supreme Court has recognized a statutory employer status for the purposes of immunity under the PRWCA scheme within the context of contract or subcontract for work services, for project owners, principal contractors or subcontractors. See Vega-Mena, 990 F.2d at 686; Santiago Hodge, 909 F.2d at 637-38 (reprinted translation of Santiago Hodge, 126 P.R. Dec. 1). "The concept of 'statutory employer' was fashioned by the Puerto Rico courts to extend an employer's immunity to certain persons who were not technically employers but were thought to deserve immunity from tort liability because of their close involvement in the employer-employee relationship." Vega-Mena, 90 F.2d at 686. This immunity only applies to contractors or project owners "who had, with regard to the injured worker, the mutual legal obligation to insure him with the State Insurance Fund." Id. at 637 (citing Santiago Hodge, 909 F.2d at 638).

"The determinant factor of immunity is the existence of that direct or indirect link between the workman who suffers the accident and the employer in the course of whose employment and as consequence of which the injury takes place." Vega-Mena, 90 F.2d at 687 (citing Ruiz Diaz v. Vargas Reyes, 109 P.R. Dec. 761 (1980)). "Absent that legal nexus linking the worker's direct employer [Securitas] to the wrongdoer [FCRG] in the 'mutual legal obligation' to insure the employee with the Fund, [the court] would be facing a 'third party' lacking statutory protection against claims by injured workers." Santiago Hodge, 909 F.2d at 638 (reprinted translation of Santiago Hodge, 126 P.R. Dec. 1). The crucial inquiry into the existence of the nexus is the nature and terms of contractual relationship between the contractor and subcontractor. Vega-Mena, 90 F.2d at 687; Santiago Hodge, 909 F.2d at 639. As such, "[i]f a contractor obligates its subcontractor in their contract to take out an insurance policy under the PRWCA, then the

contractor is immune under the exclusive remedy provision of the PRWCA." Cintron Rodriguez v. United States, 995 F. Supp. 238, 240 (D.P.R. 1998); Vega-Mena, 90 F.2d at 687; Santiago Hodge, 909 F.2d at 639.

Turning to the present case, the court finds that a genuine issue of material fact exists as to whether FCRG required Securitas to take out an insurance policy under the PRWCA, thereby creating a genuine dispute as to whether FCRG is statutorily immune from Plaintiffs' claims. Although Defendants have provided a "National Contract" between Forest City Enterprises and Securitas Security Services USA, Inc., which requires the latter company to insure all of its employees with the statutory workers compensation available in each state, the parties dispute whether this contract controls the companies' business relationship. Further, while it is clear from the record that Forest City Enterprises owns FCRG and Securitas Security Services USA owns Securitas, they are indeed legally distinct entities. The Puerto Rico Supreme Court has recognized that "the simple fact that [a parent company] wholly owns [a subsidiary] does not trigger the immunity" required for this doctrine. Santiago Hodge, 909 F.2d at 639 (reprinted translation of Santiago Hodge, 126 P.R. Dec. 1). The water is further muddied by the Letter of Engagement between Sábana Seca Land Management (signed on its behalf by FCRG) and Securitas, which lacks a provision requiring Securitas to carry workers compensation insurance and notably indicates that said agreement "shall supersede any prior understanding, agreement or contract, whether written or oral."

With respect to whether the immunity applies to the United States, the facts are even less clear. The parties have failed to point to any contractual language within any agreement between the United States and FCRG and Securitas that requires Securitas to carry workers compensation

insurance. The lack of a contract and such a provision does not evidence a close involvement in the employer-employee relationship by the United States.

Accordingly, in light of the aforementioned discussion, the court finds that genuine issues of material fact do indeed exist in this case as to the applicability of the statutory employer doctrine, and thus the court **DENIES** Defendants' motion for summary judgment at Docket No. 48 with respect to said doctrine.

B. Statute of Limitations

Turning to the statute of limitations issue, the court begins by noting that Plaintiffs are correct that under the FTCA, a claim must be presented to the "appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). Such a claim accrues when a plaintiff knows (or reasonably should have known) the existence of his injury and its cause. Donahue v. U.S., 634 F.3d 615, 623 (1st Cir. 2011). In this case, Plaintiffs admittedly knew of the injury—Rondón-Rosario's death—on October 19, 2011, the date he was killed. Thereafter, Plaintiffs presented their FTCA claim to the Office of the Judge Advocate General on October 15, 2013. Therefore, Plaintiffs' claim against the United States was timely. Accordingly, to the extent that the United States joined FCRG's motion for summary judgment as to the statutory limitations argument, the court **DENIES** said motion. The case against said Defendant continues.

With respect to the limitations period for Plaintiffs' claim against FCRG, the court must look to the Puerto Rico Civil Code, which sets a one-year statute of limitations for personal injury claims. See P.R. LAWS ANN. tit. 31, § 5298(2); Espada v. Lugo, 312 F.3d 1, 3 (1st Cir. 2002). The one-year time period begins the day after the date of accrual of the claim. Espada, 312 F.3d at 3. "For accrual purposes, the injured person must have both notice of her injury and knowledge of the likely identity of the tortfeasor." Id. (citing Tokyo Marine & Fire Ins. Co. v. Perez & Cia., De

Puerto Rico, Inc., 142 F.3d 1, 3 (1st Cir. 1998)). "If a plaintiff is not aware of some level of reasonable likelihood of legal liability on the part of the person or entity that caused the injury, the statute of limitation will be tolled." Rodriguez-Suris v. Montesinos, 123 F.3d 10, 13 (1st Cir. 1997). In the present case, Plaintiffs were made aware of Rondón-Rosario's death on October 19, 2011, the date he was killed. What is disputed is whether Plaintiffs knew or should have known of FCRG's identity prior to October 20, 2012. "In cases where a tort claim is filed beyond the one-year statutory term, plaintiff bears the burden of proving timeliness by establishing that she lacked the necessary knowledge or imputed knowledge before instituting the action." Espada, 312 F.3d at 4 (citing Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 19 (1st Cir. 2000)).

A plaintiff is required to perform due diligence to ascertain the identity of an alleged tortfeasor. See Espada, 312 F.3d at 4. Due diligence requires the plaintiff to be active in performing reasonable efforts to ascertain the identity of the tortfeasor. See Quintana Lopez v. Liggett Group, Inc., 336 F. Supp. 2d 153, 157 (D.P.R. 2004). "The key inquiry under this prong of the knowledge requirement is whether plaintiff knew or with the degree of diligence required by law would have known whom to sue." Kaiser v. Armstrong World Indus., Inc., 872 F.2d 512, 516 (1st Cir. 1989) (internal citation omitted) (internal quotation marks omitted). Furthermore, the question of whether a plaintiff has exercised reasonable diligence is usually a jury question, Villarini-Garcia v. Hosp. Del Maestro, Inc., 8 F.3d 81, 86-87 (1st Cir. 1993) The court can still employ a review of Plaintiffs' actions to determine if they were objectively reasonable.

Turning to the present case, the Court first acknowledges that the corporate structure of the relationships between the United States Navy and its contractors made FCRG's identity highly difficult to ascertain. As established above, Sábana Seca Land Management, LLC is the manager of Sábana Seca Partners. (Docket Nos. 64 ¶ 6.8; 75 ¶ 6.8.) FCRG is the managing member of


Sábana Seca Land Management and of Midwest Family Housing, and Midwest Military Communities. (Docket Nos. 64 ¶ 6.9; 75 ¶ 6.9.) FCRG was contracted by Midwest Family Housing to manage certain properties, including the Sábana Seca naval base during all times relevant to the complaint, including the day of Rondón-Rosario's death. (Docket Nos. 49 ¶ 7; 64 ¶ 7.) At that time, Rosario did not think —nor had any reason to think— that anyone other than the United States Navy was the owner or manager of the Sábana Seca naval base. (Docket Nos. 64 ¶ 1.19; 75 ¶ 1.19.)

During Rondón-Rosario's criminal proceedings, Plaintiff never heard the names of any of the corporate entities, including FCRG. (Docket Nos. 64 ¶ 1.17; 75 ¶ 1.17.) It was not until November 25, 2013, when Plaintiffs' administrative claim was denied, that the Navy informed Plaintiffs of FCRG's role as a contractor and FCRG's potential liability for being in charge of the security at the Sábana Seca base. (Docket Nos. 64 ¶ 1.24; 64-6 at 2; 75 ¶ 1.24.) Plaintiffs then filed the instant action before this court.

The court cannot conclude as a matter of law that Plaintiffs should have known that FCRG could be a potential tortfeasor. It is not unreasonable for Plaintiffs to only foresee the Navy and Securitas as the identities having potential liability, and not understanding a complex scheme of relationships between the Navy and its contractors. At this time, the court has not found any evidence that Plaintiffs had notice of any facts in connection with FCRG's involvement that would have led a reasonable person to investigate and so uncover the potential Defendant. It is up to the fact-finder to decide whether Plaintiffs exercised reasonable diligence before filing the present case against FCRG.

In sum, in light of the aforementioned discussion, the court hereby **DENIES** Defendants' motion for summary judgment as to the statute of limitations issue with respect to the United States and FCRG.

## IV. Conclusion

Accordingly, for the reasons articulated in this Opinion and Order, the court hereby **DENIES** Defendants' motion for summary judgment at Docket No. 48.

**SO ORDERED.**

In San Juan, Puerto Rico this 16th day of September, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge