# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**OFELIA ROSARIO**, *et al.*,

   Plaintiffs,

v.

**UNITED STATES OF AMERICA**, *et al.*,

   Defendants.

Civil No. 14-1410 (BJM)

## OPINION AND ORDER

Frankie Rondon-Rosario ("Rondon"), a security guard with Securitas Security Services of Puerto Rico, Inc. ("Securitas"), was tragically murdered in October 2011 by intruders who entered the former U.S. Navy Base in Sabana Seca. Over two years later, Rondon's mother—Ofelia Rosario ("Rosario")—and Rondon's brother—Eduardo Zayas ("Zayas")—brought this action under the Federal Tort Claims Act ("FTCA" or "Act"), 28 U.S.C. §§ 2671–2680, against the United States of America. Docket No. 1. Rosario and Zayas (collectively "Rosario") also sued Sabana Seca Land Management LLC ("SSLM")[1] and Forest City Residential Group, Inc. ("FCRG") under Article 1802 of the Puerto Rico Civil Code ("Article 1802"). P.R. Laws Ann. tit. 31, § 5141. The government and FCRG moved for summary judgment, Docket Nos. 48, 52, 121, 123, and Rosario opposed. Docket Nos. 63, 137. This case is before me on consent of the parties. Docket No. 180.

For the reasons set forth below, the summary judgment motions are **GRANTED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.

---

[1] Rosario moved to voluntarily dismiss the claims against SSLM, Docket No. 205, and the claims against that defendant have been dismissed without prejudice. Docket Nos. 207, 208.

2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg* v. *P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan* v. *Smith*, 904 F.2d 112, 115 (1st Cir. 1990). And the court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND[2]

Rondon began working as a security officer for Securitas in 2006. ASF ¶ 1.4; RSF ¶ 1.4. On October 19, 2011, Rondon was murdered by intruders while guarding the former U.S. Navy Base in Sabana Seca. ASF ¶ 1.5; RSF ¶ 1.5; SUF ¶ 19; OSF ¶ 19. During

---

[2] Except where otherwise noted, this narrative is drawn from the parties' Local Rule 56 submissions. After this case's prior presiding judge denied defendants' initial motions for summary judgment, Docket No. 97, defendants were permitted to file post-discovery dispositive motions. Docket No. 120. At this juncture, both sides rely on the Local Rule 56 submissions filed in support of (or in opposition to) the initial and post-discovery motions for summary judgment. *See* Docket Nos. 121 at 1, 123 at 2, 137 at 8. Accordingly, the parties' Local Rule 56 submissions include the following: defendants' initial statement of uncontested facts ("SUF"), Docket No. 49; Rosario's initial opposing statement of facts ("OSF"), Docket No. 64 at 15–22; Rosario's initial statement of additional facts ("SAF"), Docket No. 64 at 2–22; defendants' reply statement of facts ("RSF"), Docket No. 75 at 22–29; defendants' reply to Rosario's SAF ("RSAF"), Docket No. 75 at 2–22; the government's statement of facts ("GSF"), Docket No. 121; FCRG's second statement of facts ("SSF"), Docket No. 124; FCRG's supplemental statement of facts ("Supp. SF"), Docket No. 129; Rosario's second statement of additional facts ("SSAF"), Docket No. 138 at 4–38; Rosario's opposition to the SSF ("OSSF"), Docket No. 138 at 39–46; Rosario's opposition to the GSF ("OGSF"), Docket No. 138 at 46–47; FCRG's reply to the SSAF ("RSSAF"), Docket No. 145 at 4–39; and FCRG's reply to the OSSF ("ROSSF"), Docket No. 145 at 39–58. Although the parties spilled much ink on their factual statements, the dispositive issues pivot on a few uncontested facts.

Rondon's term of employment with Securitas, Rosario was aware that Rondon worked for a company called "Securitas," and Zayas similarly (though mistakenly) believed that this company was called "Security." ASF ¶¶ 1.7; RSF ¶ 1.7. Shortly after the tragic shooting, Rosario and Zayas learned that the incident occurred at the naval base and so they hurried to that location. ASF ¶ 1.9; RSF ¶ 1.9; SSAF ¶ 1.9. Securitas was an insured employer under Puerto Rico's workers' compensation law, and Securitas reported the incident to the Puerto Rico State Insurance Fund (the "Fund") in November 2011. SUF ¶ 30; OSF ¶ 30. That November 2011 report identifies Securitas as Rondon's employer, and states that the "location" of the incident was "Naval Base – Forest City." SUF ¶ 29; OSF ¶ 29.

After her son's unfortunate passing, Rosario requested reimbursement for funeral expenses from the Fund. ASF ¶ 1.13; RASF ¶ 1.13. In June 2012, an administrator for the Fund (the "Administrator") decided, after investigating the claim for benefits, that Rosario was entitled to certain benefits because Rondon was involved in a work-related incident while working for Securitas. SUF ¶¶ 27, 28; OSF ¶¶ 27, 28; Docket No. 59-1 at 2. Significantly, the Administrator memorialized his determination in a decision and relayed in this decision that Rondon "worked as a Security Guard under the patronage of Securitas Security Services of P.R." and that Rondon passed away "*while he was performing security work for a client of his employer.*"[3] Docket No. 59-1 at 2 (emphasis added). And the Administrator's decision was mailed to Rosario. Docket No. 59-1 at 3. Indeed, Rosario acknowledged at her deposition that she visited the Fund on two to three occasions to claim benefits, and that she was aware of the "determination" or "resolution" the Fund reached after the claim was submitted. SSF ¶¶ 31, 32; OSSF ¶¶ 31, 32; Docket No. 103-1 at 91–94.

Sometime "during the months" after October 2011, Rosario (who works in law office) approached an attorney at her workplace to discuss the possibility of filing a lawsuit

---

[3] Notably, Securitas' payroll invoices from September to October 2011 identified "Forest City" as the "client," Docket Nos. 49-5 at 6, 75-7 at 2, and, after Securitas billed FCRG, FCRG paid Securitas for those invoices via electronic money transfers identifying the "originator" of the payment as "FC RES GROUP INC." SSF ¶¶ 20–22; OSSF ¶¶ 20–22; Docket No. 124-4.

against Securitas. SSF ¶ 34; OSSF ¶ 34. Though Rosario characterized this discussion as "superficial," the parties agree that the attorney advised Rosario that Securitas was immune from suit because of its insurance with the Fund. SSF ¶¶ 35, 36, 38; OSSF ¶¶ 35, 36, 38. From 2011 to 2013, Rosario attended the criminal proceedings leveled against the individuals charged with murdering Rondon. ASF ¶ 1.16; RASF ¶ 1.16. Critically, Rosario admitted at her deposition that she initially was "not thinking of filing a lawsuit per se." Docket No. 103-1 at 101. However, toward the end of the criminal proceedings, Rosario heard a comment suggesting that others could be held accountable in a lawsuit, and Rosario further acknowledged that this comment prompted her to revisit the possibility of filing a lawsuit. SSF ¶ 37; OSSF ¶ 37. Rosario spoke with the attorney at her workplace once more and essentially received the same advice as before. SSF ¶ 38; OSSF ¶ 38. Thereafter, Rosario contacted her current attorney of record in September 2013. SSF ¶ 40; OSSF ¶ 40.

In October 2013, Rosario discussed options with her attorney to file a claim against the government, and, that same month, Rosario filed an FTCA administrative claim premised upon the alleged negligence of the U.S. Navy—which, in October 2011, was the owner of the land encompassing the former naval base. ASF ¶¶ 1.20, 1.22; RASF ¶¶ 1.20, 1.22; SSAF ¶ 4.19; RSSAF ¶ 4.19. The following month, that administrative claim was denied. ASF ¶ 1.23; RASF ¶ 1.23. According to the denial letter, the claim had been denied because SSLM was the contractor responsible for security at the naval base in Sabana Seca. ASF ¶ 1.23; RASF ¶ 1.23. SSLM's contact information was also provided, and that contact information stated that SSLM was under the care of FCRG. ASF ¶ 1.24. Importantly, the parties now agree that the government entered into a contract concerning the Sabana Seca Naval Base, and that, "[a]s the caretaker of the property, FCRG was in charge of" certain "duties at the Sabana Seca Naval Base"—including, among other things, "security and grounds maintenance." SSF ¶¶ 4, 6, 7; OSSF ¶¶ 4, 6, 7; SSAF ¶ 4.10; RSSAF ¶ 4.10.

And, although the parties also agree that the Navy was "a partner in the efforts related to Sabana Seca," SSAF ¶ 4.11; RSSAF ¶ 4.11, defense counsel asked FCRG's

project coordinator an inquiry targeted at the precise manner in which the Navy was a *partner* in these efforts. Docket No. 124-1 at 21. Specifically, defense counsel asked FCRG's projected coordinator whether the Navy was partnered with FCRG in providing the "functions of caretaker"—functions that included, among two or three other things, the duties of "security/ground maintenance." Docket No. 124-1 at 21–22. FCRG's project coordinator clarified that "this was what Forest City's duties were or [sic] responsibilities," as "Forest City was under a real estate agreement with the Department of Navy." Docket No. 124-1 at 21:17–22:11. Against this backdrop, Rosario proffered insufficient evidence, in her Local Rule 56 submissions or elsewhere, showing that the U.S. Navy (rather than FCRG or Securitas, the independent contractor hired to provide security services at the naval base) specifically *retained* the discrete duties for "security" or "grounds maintenance" at the naval base. Aided by counsel, Rosario filed this action in May 2014.

## DISCUSSION

FCRG contends, among other things, that Rosario's claims are time-barred because they were filed over two years after the limitations clock started ticking.[4] Docket No. 123 at 25. And the government contends, among other things, that the FTCA's discretionary function exception deprives the court of subject-matter jurisdiction over the tort claims alleging direct liability against the government for the Navy's alleged negligence. Docket No. 125 at 7–8.

**I.    Authority of Magistrate Judge**

Once the parties have consented to a magistrate judge's jurisdiction and the district court has referred the case, a magistrate judge hearing that case may act in the capacity of a district judge and has the same authority as a district judge to reconsider prior rulings.

---

[4] Zayas acknowledged that he took "no efforts" to find the entities potentially responsible for Rondon's death, SSF ¶ 58, and plaintiffs acknowledge that Zayas relied on Rosario to carry out these efforts. OSSF ¶ 58. In light of this circumstance, and because the "parties have not argued that the claim accrued on different dates for different plaintiffs," both plaintiffs will be treated "as a single" plaintiff "for the purpose of determining whether their claim was time-barred." *See Gonzalez-Perez* v. *Hosp. Interamericano De Medicina Avanzada*, 355 F.3d 1, 3 n.4 (1st Cir. 2004).

*See Cooper* v. *Brookshire*, 70 F.3d 377, 378 n.6 (5th Cir. 1995); *Jones* v. *Coleman Co.*, 39 F.3d 749, 753–54 (7th Cir. 1994); *Fieldwork Bos., Inc.* v. *United States*, 344 F. Supp. 2d 257, 274–75 (D. Mass. 2004); *Alberty-Velez* v. *Corporacion de P.R. Para La Difusion Publica*, 361 F.3d 1, 6 n.5 (1st Cir. 2004). Thus, although such authority should rarely be exercised, a magistrate judge hearing a case on consent of the parties has the same authority a district judge had with respect to that case—including the authority to alter prior rulings.

## II.     Statute of Limitations

Puerto Rico law provides that "a cause of action for civil liability will expire and become legally unenforceable one year from the 'time the aggrieved person had knowledge thereof.'" *Alejandro-Ortiz* v. *Puerto Rico Elec. Power Auth. (PREPA)*, 756 F.3d 23, 27 (1st Cir. 2014) (quoting P.R. Laws Ann. tit. 31, § 5298). The "statute of limitations is a substantive and not a procedural matter" under Puerto Rico law, and "a plaintiff will have 'knowledge' of her claim once she has actual knowledge of both the injury and of the identity of the person who caused it." *Alejandro-Ortiz*, 756 F.3d at 27. "If a plaintiff brings an action more than a year after the injury took place, she bears the burden of proving that she lacked the requisite 'knowledge' at the relevant times." *Hodge* v. *Parke Davis & Co.*, 833 F.2d 6, 7 (1st Cir. 1987) (citing *Rivera Encarnación* v. *Estado Libre Asociado de P.R.*, 13 P.R. Offic. Trans. 498, 501–02 (1982)). The concept of *knowledge* may be deconstructed "into three components." *See Alejandro-Ortiz*, 756 F.3d at 27. "First, actual knowledge occurs when a plaintiff is 'aware of all the necessary facts and the existence of a likelihood of a legal cause of action'"—a situation that occurs when "the plaintiff ha[s] knowledge of the injury and of the identity of the author of the injury." *See id.*

Second, the plaintiff may be saddled with "deemed knowledge"—"an objective inquiry where the plaintiff, while not having actual knowledge, is deemed to be on notice of her cause of action if she is aware of certain facts that, with the exercise of due diligence, should lead her to acquire actual knowledge of her cause of action." *Id.* This "is essentially parlance for the discovery rule, which stands for the proposition that [t]he one-year [statute

of limitations] does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit." *Id.* (internal quotations omitted).

Moreover, under Puerto Rico law, "if the plaintiff's lack of awareness is due to its own negligence or carelessness, then the prescriptive period will begin to run on the date the alleged tort occurred." *See Barretto Peat, Inc.* v. *Luis Ayala Colon Sucrs., Inc.*, 896 F.2d 656, 658 (1st Cir. 1990); *see also Hodge*, 833 F.2d at 8 ("if ignorance [of a fact reflects the plaintiff's] negligence . . . it would not be logical to reserve his rights, or to postpone the starting point of the statute of limitations"); *Vera* v. *Dr. Bravo*, 161 D.P.R. 308, 2004 WL 540534 (Feb. 27, 2004) ("liberal considerations on the limitation of actions are not applicable" when delay is "caused by" plaintiff's "lack of diligence"); *Vega v. J. Perez & Cia., Inc.*, 135 D.P.R. 746, 1994 WL 909638 (P.R. Apr. 11, 1994) (same).

The third component concerns "an exception to the applicability of both modalities of the 'knowledge' requirement" that is applicable when the "tortfeasor, by way of assurances and representations, persuades the plaintiff to refrain from filing suit, or otherwise conceals from the plaintiff the facts necessary for her to acquire knowledge." *See Alejandro-Ortiz*, 756 F.3d at 27. The "statute of limitations will be tolled" in such circumstances, *id.*, because "a plaintiff will not be held responsible for failing to pursue her claim more aggressively" when the tortfeasor is essentially responsible for the plaintiff's lack of knowledge. *See Rodriguez-Suris* v. *Montesinos*, 123 F.3d 10, 16 (1st Cir. 1997).

In this case, Rondon's tragic death occurred on October 19, 2011, and so Rosario learned of the injury on that date. *See Arturet-Velez* v. *R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 14 (1st Cir. 2005) ("cause of action for wrongful death arises at the time of death"). When Rosario filed her claim in May 2014, well over a year had passed since the date of this injury, and so Rosario bears "the burden of proving that she lacked the requisite 'knowledge' at the relevant times." *See Hodge*, 833 F.2d at 7. The parties quarrel over the point at which Rosario had sufficient deemed knowledge to file suit. "Determining the date on which a diligent plaintiff would have learned enough to allow her to file suit presents a

question of fact that may be submitted to the jury in an appropriate case"—even when no "raw facts are in dispute." *See Rivera-Carrasquillo* v. *Centro Ecuestre Madrigal, Inc.*, 812 F.3d 213, 216 (1st Cir. 2016). Yet, in certain cases, the court may "determin[e] that the evidence of record is so one-sided as to compel a finding . . . that the plaintiff was aware of enough facts to constitute notice and to satisfy the deemed knowledge rule of the Puerto Rico law of limitation of tort actions." *See Rodriguez-Suris*, 123 F.3d at 14–15.

In seeking to meet her burden, Rosario primarily underscores that FCRG was part of a "twisted corporate web," as well as a "complex web" comprising "corporations and partnerships," and that these circumstances required substantial discovery to untangle and made it highly difficult to ascertain the identity of FCRG. Docket No. 137 at 17, 19. But the First Circuit—applying Puerto Rico law—has repeatedly held that, "because corporate identities and intracorporate relationships are a matter of public record, knowledge of the precise corporate identity of the entity responsible for a plaintiff's injury is not required before the period prescribed by the statute of limitation begins to run." *See Rodriguez-Suris*, 123 F.3d at 16; *see also Kaiser* v. *Armstrong World Indus., Inc.*, 872 F.2d 512, 518 (1st Cir. 1989) (First Circuit applied statute of limitations and rejected plaintiff's plaints "that '[i]nformation relating to the identity of the actual manufacturers . . . was not in the public domain," and that "[i]dentifying the Defendants was an extremely complex process" and "involved an enormous amount of man hours"); *Hodge*, 833 F.2d at 7–8 (Puerto Rico law generally does not require plaintiff to "know the exact name of the tortfeasor or the precise intracorporate relationships that determine the name of the appropriate defendant").

Rosario also highlights that, because no one ever told her about FCRG or the other entities associated with FCRG, she believed there were "only two entities possibly responsible for her son's death": the U.S. Navy and Securitas. Docket No. 137 at 13. But a plaintiff generally "cannot rest on ignorance caused by his own lack of diligence as a justification for his failure to comply with the prescriptive period." *See Aldahonda-Rivera* v. *Parke Davis & Co.*, 882 F.2d 590, 593 (1st Cir. 1989). Indeed, to avoid being barred

from pursuing a claim by the statute of limitations, it is incumbent upon a plaintiff "to consult with a lawyer or otherwise investigate the claim to which she had been alerted by the factual circumstances." *See Rodriguez-Suris*, 123 F.3d at 16. Critically, the Fund Administrator alerted Rosario to the existence of a party other than Securitas in June 2012.

Around June 2012, the Fund Administrator notified Rosario that Rondon passed away "while he was performing security work for *a client* of his employer." Docket No. 59-1 at 2 (emphasis added). Yet, Rosario readily acknowledged at her deposition that she "never inquired who Securitas' client was at the Naval Base." Docket No. 103-1 at 94:21–23. Additionally, Rosario also acknowledged at her deposition that she "never asked" whether the Navy was a client of Securitas, and that she initially was not thinking about "filing a lawsuit per se." Docket No. 103-1 at 101, 130:3–5. These critical admissions would demonstrate to any reasonable jury that the Administrator alerted Rosario to the existence of a potential tortfeasor other than Securitas in June 2012, and that Rosario did not investigate the identity of Securitas' client. *See Hodge*, 833 F.2d at 7 (statute of limitations barred claim where "the workers' compensation proceedings strongly indicate[d] that plaintiff" was supplied with requisite knowledge during these proceedings); *Gonzalez-Perez*, 355 F.3d at 3 (a plaintiff's "admissions, on their own, may well suffice to commence the running of the statute of limitations under Puerto Rico law").

What is more, FCRG highlights that Securitas' payroll invoices from September to October 2011 identified "Forest City" as the "client," Docket Nos. 49-5 at 6, 75-7 at 2, as well as that, after Securitas billed FCRG, FCRG paid Securitas for those invoices via electronic money transfers identifying the "originator" of the payment as "FC RES GROUP INC." SSF ¶¶ 20–22; OSSF ¶¶ 20–22; Docket No. 124-4. Accordingly, although Rosario spilled much ink emphasizing the various government contracts, corporate relationships, and public-private partnerships that led FCRG to hire Securitas for security services at the naval base, much of that discussion is largely insignificant because: (1) "knowledge of the precise corporate identity of the entity responsible for a plaintiff's injury is not required

before the period prescribed by the statute of limitation begins to run," *see Rodriguez-Suris*, 123 F.3d at 16; (2) a plaintiff need not know "the exact name of the tortfeasor(s)," *Aldahonda-Rivera*, 882 F.2d at 593; and (3) Rosario, with sufficient due diligence, likely could have identified the client of Securitas—FCRG—through a route less circuitous than the one she apparently took during discovery and emphasized in her briefing. *See Villarini–Garcia* v. *Hospital Del Maestro, Inc.*, 8 F.3d 81, 84 (1st Cir. 1993) ("actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired").

To be sure, Rosario also attempts to stretch the statute-of-limitations exception noted above by highlighting that an attorney from her workplace advised her that Securitas was immune from suit. *See Alejandro-Ortiz*, 756 F.3d at 27. But the argument that a plaintiff "did not know [s]he could circumvent the workers' compensation statute by suing the parent company . . . [has] not been considered sufficient to toll the Puerto Rico statute of limitations." *See Aldahonda-Rivera*, 882 F.2d at 593. Nor does it matter, for the purpose of the statute-of-limitations inquiry, "[t]hat an attorney [from Rosario's workplace apparently] counseled [Rosario] against suit"—as "only the assurances of the tortfeasor, and not those of a third party, could have had any effect on the statute of limitations then running on her cause of action." *See Alejandro-Ortiz*, 756 F.3d at 29. Because plaintiffs filed their claims against FCRG well over a year after Rondon's passing, and because plaintiffs (due to their carelessness and lack of diligence) failed to investigate the client of Securitas, plaintiffs have failed meet their burden in showing that the claims against FCRG were timely filed.[5] Therefore, FCRG's motion for summary judgment is **GRANTED**.

## III.   Discretionary Function Exception

The "discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain

---

[5] Because Rosario's untimely filing was caused by her own lack of diligence, she should have filed suit by October 2012—one year after her son's death, *see Barretto Peat*, 896 F.2d at 658, and, at the very latest, by June 2013—one year after the Administrator's decision. *See Alejandro-Ortiz*, 756 F.3d at 27. Either way, Rosario has failed to demonstrate that her claim is timely.

governmental activities from exposure to suit by private individuals.'" *Carroll* v. *United States*, 661 F.3d 87, 99 (1st Cir. 2011) (quoting *United States* v. *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). "The exception, codified at 28 U.S.C. § 2680(a), immunizes conduct of government employees that arises from 'legislative and administrative decisions grounded in social, economic, and political policy,' protecting against 'liability that would seriously handicap efficient government operations.'" *Carroll*, 661 F.3d at 99 (quoting *Wood* v. *United States*, 290 F.3d 29, 36 (1st Cir. 2002)). And this "protection is available even when an employee has abused his or her discretion." *Carroll*, 661 F.3d at 99.

To determine the applicability of the discretionary function exception, "a court first must identify the conduct that is alleged to have caused the harm, then determine whether that conduct can fairly be described as discretionary, and if so, decide whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations." *Fothergill* v. *United States*, 566 F.3d 248, 252 (1st Cir. 2009). "If the challenged conduct is both discretionary and policy-based, there is no subject-matter jurisdiction for the claim." *Carroll*, 661 F.3d at 99.

A.     **Allegedly Harmful Conduct**

Rosario alleges in her complaint that the Navy negligently failed "to assure adequate protection" for Rondon, particularly in light of the high incidence of crime at or near the naval base. Docket No. 1 ¶¶ 1.4, 5.1–5.7. At this stage, the parties agree that the government entered into a contract concerning the Sabana Seca Naval Base, and that, "[a]s the caretaker of the property, FCRG was in charge of" certain "duties at the Sabana Seca Naval Base"—including, among other things, "security and grounds maintenance." SSF ¶¶ 4, 6, 7; OSSF ¶¶ 4, 6, 7; SSAF ¶ 4.10; RSSAF ¶ 4.10. Notwithstanding this critical and uncontested fact, Rosario contends that several U.S. Navy officials failed to "protect" the Securitas "security guards" hired to protect the naval base, and that the Navy "could and

should have acted to avoid . . . foreseeable harm" after FCRG alerted the Navy to various crimes at or near the Sabana Seca Naval Base. Docket No. 137 at 20–24.

### B.     Nature of the Conduct

Under the second step of the analysis for the discretionary function exception, courts must determine "whether the identified conduct 'involves a matter that the political branches have left to the actor's choice.'" *Carroll*, 661 F.3d at 100 (quoting *Fothergill*, 566 F.3d at 253). "If a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow . . . the employee has no rightful option but to adhere to the directive.'" *Carroll*, 661 F.3d at 100 (quoting *Berkovitz* v. *United States*, 486 U.S. 531, 536 (1988)). But, on the other hand, where "the government actors in question have latitude to make decisions and choose among alternative courses of action, the conduct is discretionary." *See Bolduc* v. *United States*, 402 F.3d 50, 61 (1st Cir. 2005).

In this case, Rosario contends that—although FCRG and Securitas were independent contractors, and that FCRG hired Securitas to provide the security at the base pursuant to FCRG's contractual obligations under the real estate agreement with the government—the Navy "was asked," but negligently failed, to "use its substantial resources (both monetary and non-monetary) to address the danger faced by" Rondon at the naval base. Docket No. 137 at 20. But "the decision to assign independent contractors the responsibility for safety, in particular, has been found to be within the government's discretion." *Carroll*, 661 F.3d at 102; *see also Wood*, 290 F.3d at 38 ("the Navy's selection of [an independent contractor] was a discretionary decision grounded in a broadly-based policy judgment that [this contractor] represented the 'best value' for the American taxpayer"); *Shansky* v. *United States*, 164 F.3d 688, 693 (1st Cir. 1999) ("there is no principled basis for superimposing a generalized 'safety exception' upon the discretionary function defense"); *Shuman* v. *United States*, 765 F.2d 283, 294–95 (1st Cir. 1985) (FTCA claim dismissed in light of a discretionary decision to delegate safety responsibility to an independent contractor). And when the government permissibly delegates to independent

contractors the responsibility for safety—without retaining the discrete responsibility for that duty—"[t]he contractors, not the United States," have the "responsibility for implementing procedures to ensure" that "safety." *See Carroll*, 661 F.3d at 97, 103.

In this case, FCRG, pursuant to its real estate agreement with the government, had the responsibility for the "security"—and thus the safety—of individuals at the Sabana Seca Naval Base. Indeed, FCRG hired Securitas—a separate independent contractor—precisely for that purpose. And although the Navy was "a partner in the efforts related to Sabana Seca," FCRG's project coordinator specifically testified that the responsibility or duty for security at the naval base—under the government's contract with FCRG—rested with FCRG. And neither Rosario nor the government referenced any *federal* statute, regulation, or policy that prevented the Navy from delegating the security duties at the base to FCRG. *See Carroll*, 661 F.3d at 101 (plaintiff "may not invoke Puerto Rico law" when attempting to show that the Act's discretionary function exception is inapplicable).

In the absence of such a limit on the government agency's discretion, that agency "is entitled to the protection of the discretionary function exception with respect to its conduct in employing and monitoring independent contractors charged with operating and providing security services for" land owned by the government. *See Washington* v. *U.S. Dep't of Hous. & Urban Dev.*, No. CIV.A.3:94-CV-1859-P, 1997 WL 21389, at *5 (N.D. Tex. Jan. 14, 1997). That is particularly so where, as here, there is insufficient evidence that the government agency *retained* the discrete duty to provide security after delegating this specific duty to an independent contractor. *See id.* (in case where government agency delegated security functions to independent contractors, court held that "monitoring of" those independent contractors was governed by the "discretionary function" exception, too); *see also Varig Airlines*, 467 U.S. at 819–20 ("[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind"); *Carroll*, 661 F.3d at 97 ("we think it possible for the government to hire independent contractors while retaining

responsibility for a discrete aspect of their operations, including, for example, safety measures"); *Duff* v. *U.S. By & Through U.S. Air Force*, 999 F.2d 1280, 1282 (8th Cir. 1993) ("Because the government's decision to delegate responsibility for safety is covered by the exception, we will find jurisdiction only if the government has also retained and exercised control over the project's safety"). Thus, because the Navy permissibly delegated to independent contractors the discrete duty to provide security, the nature of the alleged negligent conduct—failure to provide that security—concerned a discretionary function.

### C.    Policy-Related

The "third prong of the discretionary function exception requires" courts "to consider whether the judgment at issue 'is of the kind that the discretionary function exception was designed to shield.'" *Carroll*, 661 F.3d at 104 (quoting *Berkovitz*, 486 U.S. at 536). Put another way, this inquiry asks courts to consider whether "the exercise of discretion involve[s] (or is [ ] susceptible to) policy-related judgments." *Montijo-Reyes* v. *United States*, 436 F.3d 19, 24 (1st Cir. 2006). First Circuit law "presumes that discretionary acts involve policy judgments," *Mahon* v. *United States*, 742 F.3d 11, 14 (1st Cir. 2014), and the plaintiff bears the burden of rebutting that presumption. *See id.* at 16.

When the government hires independent contractors to perform a particular task, "[t]he relevant question is whether there is a policy justification for assigning responsibility for such [task] to the independent contractors hired to perform" the task. *See Carroll*, 661 F.3d at 104. And, as the First Circuit has highlighted, "[t]o ask that question is to answer it." *Id.* In *Carroll*, for example, the government hired independent contractors to provide "lawn maintenance and . . . childcare," and the First Circuit held that the "judgment to hire independent contractors presumably was based on an assessment of cost and efficiency concerns relating to the use of government-employee time." *See Carroll*, 661 F.3d at 104. Similarly, in *Duff*, a case where the plaintiff contended that the Air Force failed "to provide a safe living environment" at an Air Force Base in North Dakota, the Eighth Circuit reasoned that "the decision to delegate" to an independent contractor the responsibility for

safety "allowed the Air Force to 'tak[e] advantage of a contractor's special expertise, thereby creating the opportunity for a safer, more efficient operation.'" *See Duff*, 999 F.2d at 1281–82; *Washington*, 1997 WL 21389, at *5 (agency's "supervision of its contractors' operation of the Property and of their implementation of security standards was directly related to, and guided by, public policy considerations regarding residential safety").

In this case, Rosario made no effort whatsoever (and thus waived her opportunity) to rebut the presumption that the Navy's delegation of the security functions at the Sabana Seca Naval Base involved a policy judgment. *See Mahon*, 742 F.3d at 14; *United States* v. *Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). This policy judgment "presumably was based on an assessment of cost and efficiency concerns relating to the use of government-employee time." *See Carroll*, 661 F.3d at 104. Because Rosario effectively contends that the Navy had a duty to cease its delegation of the security functions at the naval base, add extra financial or non-monetary resources to help the independent contractors carry out those delegated functions, or otherwise make some decision concerning the government's delegation of the security functions at the naval base, the Navy officials' alleged failure to make one of those decisions (even if such conduct was an abuse of discretion) related to a policy judgment within the ambit of the FTCA's discretionary function exception. *See Carroll*, 661 F.3d at 104. Thus, because the court lacks subject-matter jurisdiction over the FTCA claim encompassed by the discretionary function exception, the government is entitled to summary judgment on the FTCA claims alleged in the complaint.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment are **GRANTED**, and the complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 16th day of August 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge